# FEDERAL DEFENDER SERVICES
## OF WISCONSIN, INC.

LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Guy Cardamone, Madison Supervisor
John W. Campion
Alexandra Douglas
Ramuel R. Figueroa
Matthew Giesfeldt
Jonathan Greenberg
Gabriela A. Leija
Julie K. Linnen
Dennise Moreno
Tom Phillip
Joshua D. Uller
Alex Vlisides

411 East Wisconsin Avenue
Suite 2310
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

May 28, 2025

Honorable Judge J.P. Stadtmueller
Eastern District of Wisconsin
517 East Wisconsin Avenue
Milwaukee, WI 53202

RE:     *United States v. Kirk Mickelson*
        Case No.  2:24-cr-00192

Dear Judge Stadtmueller:

When Kirk Mickelson was released from federal prison in 2023, he made a genuine effort to rebuild: he got a job, found housing, and stayed sober – a staggering feat for someone like Mr. Mickelson, who has struggled with substance abuse since he was just 11 years old. Unfortunately, the weight of longstanding mental health struggles left untreated and an unstable relationship with a partner that had her own difficulties with addiction, led Mr. Mickelson to relapse. It was in the midst of that relapse that Mr. Mickelson committed the instant offense.

Despite those struggles, Mr. Mickelson sought help. He admitted to his relapse and affirmatively sought mental health and substance abuse treatment. In fact, before his arrest in this case, Mr. Mickelson had enrolled in an intensive partial hospitalization program, which he was attending five times a week, six hours a day.

Mr. Mickelson respectfully asks the Court to impose a total sentence of 18 months: 12 months and a day on the new charge of attempting to transfer a silencer, and an additional 6 months on the supervised released revocation in Case No. 14-cr-112. Such a

sentence would balance the seriousness of the offense against the Mickelson's proactive efforts to seek treatment for his mental health and addiction and his genuine steps toward rehabilitation. It would also appropriately weigh the ongoing crisis with the Bureau of Prisons that has impacted staffing, programming, and even halfway house release for inmates, rendering custodial sentences more punitive now than before.

## BACKGROUND

### *Mr. Mickelson initially had a positive adjustment to federal supervision.*

Kirk Christian Mickelson was released on federal supervision in July 2023, after serving about a decade in federal prison. The 142-month sentence Mr. Mickelson received in his prior federal case, *United States v. Mickelson*, Case No. 14-cr-112 (E.D. Wis), was magnitudes longer than any sentence Mr. Mickelson had ever served before.[1] In fact, although Mr. Mickelson had done short stints in jail here and there, he had never been to prison.

When Mr. Mickelson completed his sentence, he was committed to re-entering society and building a new life for himself. And for a while, he did just that. He found his own apartment, regularly met with his probation officer, and immediately found employment. While he was still in the halfway house, Mr. Mickelson worked in steel fabrication with Cutting Edge and later worked with National Spring and Alignment before returning to Cutting Edge once again. PSR ¶¶ 96-97.

---

[1] Indeed, that sentence is also potentially longer than a similarly situated defendant might receive today. At the time of Mr. Mickelson's sentencing for distributing methylone, the parties and the Probation Office proposed using a drug conversion ratio of 500:1 grams to calculate Mr. Mickelson's sentencing guidelines. However, courts and the Sentencing Commission alike have since rejected that conversion ratio for methylone. *See, e.g.*, *United States v. Sepling*, 944 F.3d 138, 147 (3d Cir. 2019) (finding sentencing counsel ineffective for failing to challenge the 500:1 ratio used for methylone because "available evidence would have supported a well-reasoned argument from Sentencing Counsel that the 500:1 ratio was not supported by then-current scientific research and seriously overstated the societal threat"); *see also* USSG §2D1.1 (setting the conversion rate for synthetic cathinones to a 380:1 ratio); *see also* §2D1.1 cmt. 27(D) (noting that in addition to the reduced ratio, "a downward departure may be warranted in cases involving methylone, a substance of which a greater quantity is usually needed to produce an effect on the central nervous system similar to the effect produced by a typical synthetic cathinone").

Perhaps most notably, however, Mr. Mickelson maintained his sobriety and tested negative for all controlled substances for the first six months of his supervision. *See United States v. Mickelson*, Case No. 14-cr-112 (E.D. Wis), Revocation Report, ECF No. 488, at 2. It was a laudable accomplishment, considering that Mr. Mickelson has struggled with substance abuse since he was just 11 years old, PSR ¶ 85, and that substance abuse was an issue that has permeated throughout his entire life and his family. Mr. Mickelson's father struggled with alcoholism so severe that he would drink on a daily basis, vomit and pass out in front of his children, and eventually accrued no less than five convictions for Operating While Intoxicated. PSR ¶ 66. Mr. Mickelson's mother, Cynthia Mickelson, on the other hand, developed her own addiction to opiates after being diagnosed with cancer in 2004, when Mr. Mickelson was about 15 years old. Though she survived her cancer, Ms. Mickelson eventually tragically succumbed to her addiction and died of a fentanyl overdose in 2020.

Mr. Mickelson was committed to forging a different path for himself than that of his parents. Although he was not allowed to participate in BOP's gold standard for substance abuse treatment, the Residential Drug Abuse Program ("RDAP"), before his release, Mr. Mickelson managed to remain sober for half a year when he returned to the community.

> ***Unfortunately, Mr. Mickelson's unaddressed mental health needs led to his eventual relapse.***

Things took a turn, however, in December 2023. Mr. Mickelson had entered into a romantic relationship with Sarah Bishop. Like Mr. Mickelson, Ms. Bishop struggles with mental health and substance abuse. Unlike Mr. Mickelson, however, Ms. Bishop was not sober at the time. Eventually, Mr. Mickelson was not able to maintain his sobriety while living with someone who was a daily active drug user, and Mr. Mickelson relapsed. Mr. Mickelson began testing positive for methamphetamine in February 2024, setting back much of the progress he had made.

Mr. Mickelson was, however, honest about his struggles. He told his probation officer about his relapse. Not only that, but Mr. Mickelson was also proactive in getting the help he needed to get his life back on track. As his revocation report explains, in March 2024, "Mr. Mickelson expressed the need for mental health treatment[,] indicating he believed that was a driving factor in his relapse and continued drug use." Revocation Report at 3. Mr. Mickelson "noted symptoms of depression and requested specific services to target these issues." *Id.* Indeed, Mr. Mickelson has a long, well-documented history of mental

May 28, 2025
Page 4

health struggles. Early on in his incarceration in 2014, he attempted suicide. PSR ¶ 78. And Mr. Mickelson received medication and mental health treatment throughout his decade-long incarceration with BOP. *See* PSR ¶ 80 ("Records from the Bureau of Prisons show an assessment was completed in April 2017, which diagnosed Mr. Mickelson with Bipolar II Disorder and Depressive Disorder. . . . [R]ecords show he was prescribed medication throughout his time in prison."). That treatment, however, did not continue upon his release.

It wasn't until Mr. Mickelson relapsed and affirmatively requested and proactively sought mental health treatment in Spring of 2024 that Mr. Mickelson restarted that treatment. In June of 2024, he participated in a psychiatric evaluation. PSR ¶ 81. He was again diagnosed with Bipolar Disorder, as well as ADHD and methamphetamine use disorder. Revocation Report at 8. He was prescribed medication for Bipolar Disorder, with the psychiatrist noting that the ADHD would be addressed once the Bipolar Disorder improved and stabilized. *Id.*

Mr. Mickelson also began participating in mental health counseling, "as he reported continued struggles with depression and anxiety," and believed "his underlying mental health symptoms may be driving his continued drug use." *Id.* Mr. Mickelson consistently attended counseling throughout the month of July. However, in early August 2024, he butted heads with his counselor, who Mr. Mickelson felt was not being understanding of his transportation difficulties. Given the circumstances, both Mr. Mickelson and his probation officer "agreed that Mr. Mickelson would need a new counselor." *Id.*

After that, Mr. Mickelson once again proved how committed he was to receiving treatment. He proactively sought out and enrolled in a partial hospitalization program at Rogers Behavioral Health in August 2024. The program was more intensive than the individual counseling Mr. Mickelson had done in July, and it was more tailored to his needs, as it focused on both mental health and substance abuse. *Id.* at 9. Mr. Mickelson attended the program five days per week, Monday through Friday, for six hours each day – attendance which was verified by the probation office. *Id.* Unfortunately, Mr. Mickelson's participation in the program was cut short after his arrest for this offense in early September.

> **It is in the midst of his relapse and daily methamphetamine use that Mr. Mickelson committed this offense.**

Mr. Mickelson was months into his addiction spiral, and only weeks into his mental health treatment when he was arrested for this offense. Mr. Mickelson, who frequently used Alibaba – a Chinese-based online marketplace like eBay or Amazon that offers a sea of legitimate, cheap, goods to consumers – came across a posting for a silencer kit and made the decidedly poor decision to order one. The kit contained all the component pieces for a suppressor, but was not immediately functional. That's because the endcaps – where a bullet would need to travel through – did not have an opening. The endcaps can be drilled, however, and the pieces put together to assemble a suppressor. These types of kits have been marketed widely online as a purported gray area, or legal loophole to federal laws and regulations on firearms and suppressors. *See* Dhruv Mehrotra, *Facebook and Instagram Ads Push Gun Silencers Disguised as Car Part*, Wired (Jan. 3, 2025) (noting that the ads often target buyers "who may not understand the legal risks," by including language like, "You know those things that are definitely not suppressors, even though they look just like suppressors. . . . Well, but they're still not suppressors because they don't have a hole in the other end. So you can legally own one . . . ."). When Mr. Mickelson encountered one such listing online, it piqued his curiosity. And, of course, once assembled and drilled, he could sell suppressor for more than he had paid online for the kit. *See id.* (noting the kits are sold for as cheap as $50 online). As someone dealing with a significant and ongoing addiction to methamphetamine with no stable income since he had since lost his job, Mr. Mickelson was in no shortage of need for a way to make a quick buck.

Of course, as someone on federal supervision, Mr. Mickelson had absolutely no business wading into any purportedly "gray area" of the law – not that the area is actually all that gray. His purchase reflected seriously poor judgment, and worse still was his decision to request that the seller send him a replacement kit to a different address when the first one never arrived after being seized. To be clear, Mr. Mickelson knew he shouldn't have been doing what he was doing, even if he didn't quite grasp the full extent of the illegality of his original online purchase.

Mr. Mickelson has accepted full responsibility for his poor decision-making, and he understands that he must face the consequences for his actions. However, in deciding what his sentence should be, this Court should weigh the fact that Mr. Mickelson's bad

May 28, 2025
Page 6

judgment was certainly influenced by his struggle with substance abuse, and the fact that by the time he was arrested, Mr. Mickelson had shown he was committed to seeking treatment for both his substance abuse and mental health more broadly.

## SENTENCING CONSIDERATIONS

Mr. Mickelson respectfully requests that the Court impose a sentence of 12 months and a day on his new substantive conviction in this matter, and 6 additional months for his revocation in Case No. 14-cr-112, for a total sentence of 18 months. In support of that recommendation, Mr. Mickelson highlights the following:

### *Mr. Mickelson's guidelines are overstated.*

The probation office has calculated Mr. Mickelson's guideline range as 37 months to 46 months. While Mr. Mickelson does not object to the calculation, he does maintain that the range overstates his offense and culpability in several ways. First, the guideline used to calculate Mr. Mickelson's range is the same one used for any firearm offense – §2K2.1. However, it's worth noting that the object of Mr. Mickelson's offense is a suppressor kit, not a firearm itself. The kit, in its current state, was not a functional suppressor. Even once assembled, a suppressor, without a firearm, does not pose the same danger. Importantly, when Mr. Mickelson's home was searched pursuant to a warrant, no actual functional firearm was recovered. But the guidelines do not provide for such a distinction.

Mr. Mickelson's criminal history is also in some ways overstated. Mr. Mickelson falls in criminal history category IV based on two convictions that score for points: his 2014 drug federal drug conviction, which scored for three points, and a 2013 bail jumping conviction, which also scored for three points. Notably, however, Mr. Mickelson's 2013 bail jumping conviction was under the "party to a crime" modifier, and that's because Mr. Mickelson was not the one who violated his bond conditions. Instead, Mr. Mickelson was charged because he responded to his girlfriend's letters while he was in custody when *she* had been ordered to have no contact with him. It was, therefore, Mr. Mickelson's girlfriend who violated her bond conditions, not Mr. Mickelson. To see how that single conviction inflates Mr. Mickelson's criminal history, one need only consider the fact that the bail jumping conviction for violating his girlfriend's bond conditions scored *as many* criminal history points as Mr. Mickelson's conviction for heading a conspiracy to import

and distribute methylone. Without the three points for that bail jumping conviction, Mr. Mickelson would drop to criminal history category II.

The guidelines, of course, also don't account for other mitigating factors here, including the fact that Mr. Mickelson's offense was motivated, in part, by his struggles with mental health and substance abuse, and that Mr. Mickelson was proactively and affirmatively working to address both of those things.

> **BOP staffing shortages and budget cuts stand to make any custodial sentence this Court imposes more punitive than before.**

Nor do the guidelines account for other important and relevant factors, such as the burgeoning costs of incarceration – a concern this Court has frequently voiced– or the increasingly poor conditions and dwindling programming opportunities within the BOP for individuals like Mr. Mickelson. This Court is already well-aware of the devastating staffing shortages within the BOP. *See* Forbes, *Union Says Staffing Shortages Within Federal Bureau of Prisons Leading to More Violence* (Dec. 10, 2021). BOP's staffing crisis over the past several years has resulted in teachers, case managers, and treatment providers being pulled away from their primary duties to instead act as correctional officers, leaving safety and programming "at the wayside." U.S. Senate Committee on the Judiciary, *Durbin Discusses BOP Staffing Crisis with National President of the Council of Prison Locals* (March 28, 2023). The problem is only slated to get worse as the current administration continues to slash BOP funding, even recently announcing a hiring freeze within the BOP. *See* Michael Sisak, *Cash-strapped Bureau of Prisons freezes some hiring to 'avoid more extreme measures,' director says*, AP News (May 9, 2025) (noting that a the recently announced "hiring freeze is likely to exacerbate a staffing crisis at the agency, which has more than 4,000 unfilled positions").

The staffing shortages at BOP not only make any custodial sentence more punitive due to the poor conditions such shortages create within BOP facilities, but they also may have real and practical effects on the length of Mr. Mickelson's sentence. Given the nature of his charges, Mr. Mickelson should be eligible to earn time off his sentence through the First Step Act. However, given the increasing staffing shortages at BOP, many facilities simply do not have the ability to staff and operate much of the First Step Act programming, leaving inmates without the ability to earn credits.

But that is not the only way that BOP budget pressures stand to have a real effect on Mr. Mickelson's sentence. In the past, inmates like Mr. Mickelson typically served the last six months of their sentences in a halfway house. *See* Walter Pavlo, *Under Budget Pressure, Bureau of Prisons to Cut Halfway House Time*, Forbes (April 01, 2025). Last month, however, BOP announced that it was now limiting an inmate's halfway house time to just 60 days – cutting the length of halfway house stays by two thirds – due to budget constraints. *Id.* The change means that Mr. Mickelson will likely have to serve more time in actual custody than a similarly situated defendant would have before BOP made these changes. Any custodial sentence this Court imposes, therefore, will be more punitive than the same sentence would have been in the past.

### Mr. Mickelson has continued to show his commitment to rehabilitation by using his time in pretrial detention productively.

Although Mr. Mickelson was certainly facing struggles when he was on supervision, he also showed a remarkable commitment to seeking treatment, addressing his substance abuse, and working towards his rehabilitation. Though the opportunities for programming are more limited in a pretrial detention facility, Mr. Mickelson has sought ways to continue to use his time productively while at Ozaukee County Jail. While there, Mr. Mickelson elected to participate in the facility's GED classes. The lead instructor of the program submitted a letter detailing how Mr. Mickelson "worked hard" in the class, had a "friendly and positive" demeanor, and set high standards for himself, even asking to retake one of the tests to get a higher score. *See* Ex. A, Letter from Jonathan Hahm. Indeed, Mr. Mickelson achieved "high honors" on the social studies portion of the exam. *See* Ex. B, GED Materials.

Mr. Mickelson also participated in other types of programming, and successfully completed classes like Prep Domestic Violence, Anger Management, Financial Literacy, and Life Skills. *See* Ex. C, Certificates. And just like when he was in the community, Mr. Mickelson advocated for himself within Ozaukee County Jail to make sure he would continue receiving mental health treatment, which he has.

### CONCLUSION

Mr. Mickelson's conduct, while undeniably serious, was not born out of a pure disregard for the law. Rather, in many ways, it was tied to his addiction and mental illness and the instability he faced as a result. However, even before his arrest, Mr. Mickelson had sought

help and treatment, going as far as enrolling himself in an intensive partial hospitalization at Rogers Behavioral Health in an effort to get sober. In the time since his arrest, Mr. Mickelson has continued that work, even from the confines of pretrial detention, by advocating for his own mental health treatment and participating in whatever limited programming he is offered.

A total sentence of 18 months – 12 months and a day in this matter, followed by 6 months for his pending revocation – accounts for the seriousness of Mr. Mickelson's offense while recognizing the mitigating context in which it occurred. It would also reflect Mr. Mickelson's sincere commitment to recovery, meaningful progress towards rehabilitation, and structural factors – like a hollowed-out BOP – that make incarceration today more punitive (and expensive) than ever.

Sincerely,

*/s/ Dennise Moreno*